# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 8235 | **DATE** | 10/2/2001 |
| **CASE TITLE** | Mary Pat Herman vs. United States, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the foregoing reasons, the court renders judgment in favor of the Plaintiff and against the Defendant United States. The court holds that the Defendant United States and Defendant Lopez are jointly and severally liable for Plaintiff's economic damages in the amount of $85,862.04, and the court also holds that Plaintiff's non-economic damages of $250,000 are to be apportioned 95% to the Defendant United States and 5% to Defendant Lopez.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

OCT 03 2001
date docketed

docketing deputy initials

Document Number

52

TP  courtroom deputy's initials

COPY
FILED FOR DOCKETING
01 OCT -2 PM 4:54

Date/time received in central Clerk's Office

date mailed notice

mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

OCT 0 2 2001

| | | |
|---|---|---|
| MARY PAT HERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 97 C 8235 |
| v. | ) | |
| | ) | HONORABLE JOHN A. NORDBERG |
| UNITED STATES, ABEL LOPEZ, | ) | |
| STATE FARM INSURANCE CO., | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mary Pat Herman ("Plaintiff") was injured in a car wreck in California. Plaintiff filed suit against the motorist who struck her vehicle, Abel Lopez ("Lopez"), her insurer, State Farm Insurance Company ("State Farm"), and the United States ("government"). The negligence claim against the government, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671, *et seq*, was based on Plaintiff's theory that the accident was caused by a spare tire that fell off a military truck and dangerously disrupted traffic. After State Farm settled and Lopez defaulted, the case proceeded to a bench trial on the remaining claim against the government. This memorandum opinion presents the court's findings of fact and conclusions of law.

## BACKGROUND

On June 12, 1996, just past the morning rush hour, Plaintiff was driving a Saab rental car southbound on California Highway 15, the Encinitas Freeway. She was accompanied by passenger William Wilson ("Wilson"). In an adjacent lane to her right, several car lengths

ahead, Lopez was driving his pickup truck. At some point, the car ahead of Lopez swerved to avoid a tire/wheel assembly[1] ("the tire") in the road. Lopez struck the tire and lost control of his vehicle, first careening to the right and striking a guard rail, and then careening across traffic back to the left and striking Plaintiff's vehicle. The primary point of impact was the right windshield pillar on the passenger side of Plaintiff's rental car. Plaintiff's badly damaged vehicle[2] came to a stop near the left highway divider, where both Plaintiff and Wilson left the vehicle under their own power. The windshield was shattered in the accident; while Wilson had only tiny cuts on his arms, Plaintiff was in severe pain from glass shards in her eyes.

Slightly ahead of Plaintiff and Lopez at the time of the accident, Jose Luis Jiminez ("Jiminez"), accompanied by James Hotchkiss ("Hotchkiss"), was driving a 1990 Chevrolet C70 three-ton box truck, #G71-14392. Both Jiminez and Hotchkiss were employees of Marine Corps Community Services ("MCCS"),[3] and the truck was a General Services Administration ("GSA") vehicle being leased to MCCS. The truck was equipped with a spare tire "cage," which was a rack of flat stock steel that was welded to the bottom frame of the truck behind the passenger

---

[1] The object in question, which disappeared shortly after the accident, was a ten lug truck-type wheel assembly with a mounted tire. Its weight has been estimated at between 150 and 200 pounds.

[2] The vehicle was ultimately deemed a total loss.

[3] MCCS is an entity that provides recreation and morale-related services to the Marine base at Camp Pendelton. The main MCCS facility, which included the main motor pool and repair facility was located at the Marine base at Camp Pendelton. MCCS also apparently had a smaller facility at Del Mar Beach, to which employees and vehicles were assigned. Jiminez worked out of the Del Mar Beach facility.

area.[4] As they were driving, Jiminez and Hotchkiss felt a large "bump" under their vehicle and immediately pulled over to the side of the road to check for damage. They found nothing amiss on the truck, but they noticed that there was no spare tire in the cage and that there was a crash some distance behind them.

California State Trooper David Ellison arrived on the scene and interviewed the relevant witnesses. He cited Lopez for driving without insurance and prepared a report in which he concluded that the accident was caused by Lopez following too closely. Trooper Ellison also investigated the government truck just up the road from the accident. Ellison was put on notice of the truck by Lopez, who told Ellison that an unidentified witness told him that the tire in the road had fallen off the government truck. (Ellison Dep. at 17-18.) Ellison spoke with Jiminez about the tire, noting that there was no spare in the truck's spare tire cage. Jiminez told Ellison that he was not sure if there had been a spare in the cage when he left MCCS that morning,[5] and that he would inquire at the base motor pool and find out. Jiminez subsequently checked with the motor pool, and, upon being informed that there had been a spare in the rack, notified Ellison. The government maintains that this information was erroneous, and that the tire in the road did

---

[4] The cage was designed to hold a spare tire at an upward angle of approximately 45 degrees, and though gravity was intended to hold the heavy spare in place, some operators would further secure the spare with a chain and padlock.

[5] Ellison's report also indicates that Jiminez stated that an unidentified motorist told Jiminez that the spare tire fell off the government truck. (Ellison Dep. at 19.) At his deposition, Jiminez did not recall such a conversation with an unidentified witness, and the government denies that it took place.

3

not belong to the government truck.[6]  Unfortunately, the tire has never been recovered, and the only evidence that survives regarding the tire is a color photo taken by Officer Ellison.

Since the accident, Plaintiff has suffered various medical problems with her eyes and back.  Plaintiff underwent various treatments for several months for the corneal scarring in her left eye, culminating in a corneal micropuncture operation on July 21, 1997.  Although this procedure initially helped, it is expected that she will undergo an additional eye operation in the near future.  As to her back, she consulted both orthopedists and neurologists, and underwent varying treatments in the two years after the accident, including chiropractic care, physical therapy, and medication.  Ultimately, when all else failed and her condition continued to worsen, she underwent anterior fusion surgery of her C4, C5, C6, and C7 cervical disks in May 1998.  The procedure, which included inserting a titanium rod to support her neck, was considered a success, although it left her with a limited range of motion in her neck.

Plaintiff filed this action against the government, Lopez, and State Farm on November 25, 1997. Earlier in 1997, Plaintiff had filed an administrative claim against the government for $100,000.  She later moved, over government objection, to increase her claim based on the subsequent discovery of the severity of her spinal problems.  The court granted Plaintiff's motion, without prejudice, on December 30, 1998, and Plaintiff amended her damages claim to $2,000,000.  Lopez never answered or appeared in the action, and Plaintiff obtained a default

---

[6]The government initially conceded in their interrogatory responses that the tire in the roadway was the spare from the government truck. (Response to Interrogatory No. 9).  The government subsequently filed an Amended Response, which recanted the earlier concession and stated that the government could not ascertain the identity or origin of the tire, and a Supplementary Response, which stated that, upon reviewing a color photo of the tire, it could not be from a government vehicle because it was a retread.

judgment against him on September 7, 2000. State Farm, who reportedly settled with Plaintiff, was dismissed pursuant to the government's motion on same date. The case went to a bench trial on the FTCA claim against the government.[7]   The Plaintiff's position was that the government was negligent in allowing the tire to fall into the road and cause the car accident which injured her. Moreover, Plaintiff maintains that the accident was the cause of all her eye and spinal problems. The government took the position that the tire did not come from the government truck, that Lopez caused the accident, and that Plaintiff's back problems were due to a pre-existing degenerative condition, cervical spondylosis,[8] and not the accident.

The bench trial took place in a somewhat unusual manner. The parties opted to present most of the witnesses via their deposition transcripts, which were admitted in their entirety without objection from either side. The only witnesses to testify in open court were the Plaintiff, Robert Hollowood, the motor transport inspector for MCCS at Camp Pendelton, and Dr. Frank Phillips, the government's medical expert. In assessing the credibility of these witnesses and determining the weight to be given to their respective testimony, the court has taken into account the following: (1) the witness's intelligence; (2) the witness's memory; (3) the witness's ability

---

[7] The court concludes that it has jurisdiction pursuant to 28 U.S.C. §1346(b). There was some confusion after the start of trial regarding the court's jurisdiction. While the court and parties initially believed that the truck was a U.S. Navy/Marines vehicle, at trial it was made clear that the truck was actually a GSA vehicle that was leased by the Marines Corps Community Services ("MCCS"). However, entities such as MCCS, which are operated with nonappropriated funds, are considered federal agencies under the FTCA because they are integral parts of the U.S. military services. *See generally U.S. v. Holcombe*, 277 F.2d 143 (4th Cir. 1960); *U.S. v. Forfari*, 268 F.2d 29 (9th Cir.), *cert. denied*, 361 U.S. 902 (1959).

[8] Cervical spondylosis is a degenerative condition in the cervical spine in which the disks wear out and the joints become arthritic, frequently accompanied by neurological symptoms and neck and arm pain. (Trial Transcript, Vol. II at 221.)

and opportunity to observe; (4) the witness's manner while testifying; (5) any interest, bias or prejudice of the witness; and (6) the reasonableness of the witness's testimony when considered in light of all the evidence in the case. In evaluating the case as a whole, the court reviewed all pleadings, heard the opening statements of counsel and the testimony of the witnesses, reviewed the written closing arguments of counsel, and considered all the evidence and law presented, including all exhibits received in evidence and the court's contemporaneous trial notes. The court drew reasonable inferences from the evidence, and evaluated the legal principles presented by the parties and developed through the legal research of the court.

## LEGAL STANDARDS

The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671 *et seq.*, "effects a limited waiver of sovereign immunity for the United States," which "renders the federal government liable in tort as a private individual would be under like circumstances." *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1296 -7 (7th Cir. 1991). The FTCA "incorporates the substantive law of the state where the tortious act or omission occurred...." *Id.* at 1297. The FTCA bars actions for damages in excess of the administrative claim unless the plaintiff proves newly discovered evidence that could not have been reasonably discovered at the time of the claim or proves intervening facts. *See* 28 U.S.C. §2675(b). The key is forseeability—if Plaintiff's ultimate condition was reasonably foreseeable when the claim was made, an increase should not be allowed. *Milano v. United States*, 92 F.Supp.2d 769, 774 (N.D. Ill. 2000).

The parties agree that because the accident occurred in Southern California, California tort law applies. To prevail on an action for negligence under California law, "plaintiff must

show that defendants owed her a legal duty, that they breached the duty, and that the breach was a proximate or legal cause of her injuries." *Saelzer v. Advance Group 400*, 23 P.3d 1143, 1145 (Cal. Sup. 2001) (internal cite omitted). *See also Leslie G. v. Perry & Associates*, 50 Cal.Rptr.2d 785, 789-90 (Cal.App. 1996). To demonstrate causation, the plaintiff must show "that the defendant's act or omission was a 'substantial factor' in bringing about the injury...." *Id* at 1150 (internal cite omitted).[9] California tort law permits the recovery of damages for the aggravation of a preexisting condition:

> A person who has a condition or disability at the time of an injury is not entitled to recover damages therefor. However, a plaintiff is entitled to recover damages for any aggravation of such preexisting condition or disability caused by the injury. This is true even if a condition or disability made plaintiff more susceptible to the possibility of ill effects than a normally healthy person would have been, and even if a normally healthy person would not have suffered any substantial injury. Where a preexisting condition or disability is so aggravated, the damages as to such condition or disability are limited to the additional injury caused by the aggravation.

California Book of Approved Jury Instructions, BAJI 14.65. This rule is consistent with Illinois tort law, as applied in FTCA cases in this circuit. *See Reising v. United States*, 60 F.3d 1241, 1244 (7th Cir. 1995) (tortfeasor liable for aggravation of preexisting condition or acceleration of progressive disease); *Kwasny v. United States*, 823 F.2d 194, 198 (7th Cir. 1987) (that younger or more robust person would not be injured is irrelevant, wrongdoer takes victim as he finds him). Under California tort law, a successful Plaintiff is entitled to recover both economic damages (medical expenses, lost wages, and other out of pocket costs) and non-economic damages (pain,

---

[9]Plaintiff has not cited or discussed California law to any real extent. As she does not seem to be relying on a violation of any particular motor vehicle code provision, Plaintiff is apparently proceeding on a theory of simple negligence rather than negligence per se or some related doctrine. *See, e.g., Victor v. Hedges*, 91 Cal.Rptr.2d 466 (Cal. App. 1999).

suffering, inconvenience, loss of enjoyment). *See* California Book of Approved Jury Instructions, BAJI 14.00, 14.10, 14.13, 14.76.

## DISCUSSION

The contested issues in this case are narrow. The first is whether the Plaintiff has shown any negligence on the part of the government, notably whether the tire in the road fell from the government truck. The second, assuming the government was responsible for the tire, is whether the Plaintiff has adequately shown that the tire in the road was a cause of the accident. The third, assuming propositions one and two are established, is whether the accident was the cause of Plaintiff's physical problems that led to surgery. The fourth, if liability is established, ascertaining what is a fair measure of Plaintiff's damages.

Our analysis of these issues is complicated by several factors. First, there is an absence of direct, unequivocal evidence. Second, the parties have chosen to rely largely on depositions rather than in court witness testimony, which has limitations. Third, neither side has spent much effort discussing California law, which they agree controls the case. Plaintiff, who carries the burden of proof, did not deign to cite a single case in her trial briefs. Fourth, and most important, both sides have generally chosen to take somewhat extreme positions, none of which are entirely supported by the limited evidence in the case.

### A. Government's Alleged Negligence

The Plaintiff maintains that she has proven that the tire came from the government truck, and that the tire, and not Lopez, was the *sole* cause of the accident. The government's position is that the Plaintiff has no credible evidence showing any connection between the tire in the roadway

8

and the government vehicle, and that, in any event, the accident was caused *entirely* by Lopez's negligence in failing to avoid the tire by swerving around it. Neither position is tenable in its entirety.

The more complex issue is whether the Plaintiff has proven that the tire in the road belonged to the government truck, which will require an analysis of the evidence in some detail. Plaintiff relies heavily on the government's disavowed interrogatory response, the deposition testimony of the government agents and the state trooper, and, for want of a better term, the laws of probability.

Despite the absence of an eye witness and the loss of the tire, Plaintiff has conjured forth a fairly strong circumstantial case. While none of the government agents claim to recall for certain whether the truck had a spare tire in the cage the morning of the accident, they imply that it most likely would have. The driver, Jiminez, stated that, while he did not recall checking whether the truck had a spare that day, when he had driven it previously, it had a spare at least 90-95% of the time. (Jiminez Dep. at 21-22, 39-40.) Further, he stated that the tire in the photo looked similar to the tires on the truck. (*Id.* at 54.) Lastly, he stated that he checked with the motor pool dispatcher after the accident and confirmed that there had been a spare tire in the cage when he left that morning. (*Id.* at 33.) Roberto Lopez, a mechanic at MCCS, stated that trucks were supposed to have a spare, and mechanics were to notify a supervisor if it was missing. (R. Lopez Dep. at 8-10.) Charles Sharp, the MCCS dispatcher at Camp Pendelton, stated that the truck had definitely had a spare when it was first assigned to the Del Mar Beach facility (although he was uncertain what the Del Mar Beach facility did with the truck after that). (Sharp Dep. at 12-3.) Plaintiff also emphasizes that, given the traffic flow, the tire could not have been on the road for

very long before disrupting traffic. Therefore, it must have come from a vehicle in close

proximity to the accident. While there are no measurements indicating the precise distance

between the spot where the government truck pulled off the road and the accident site, they were

quite close in the context of highway speeds. Witness estimates of the distance appear to be

approximately one-quarter mile — the distance a vehicle traveling 60 mph can cover in 15

seconds.

Even more significant are Jiminez and Hotchkiss' statements as to why they had pulled

their vehicle over at the time of the accident. Jiminez stated that he felt a large bump at the back

of the truck and pulled over to check for damage. (Jiminez Dep. at 42-3.) Jiminez commented

that he had seen nothing in the road before the bump, the bump was just on the back tires, and that

the front tires never ran over anything. (Id. at 70, 73-4.) Hotchkiss stated that he felt a large

bump at the back of the truck and the rear wheels "raised up." (Hotchkiss Dep. at 9.) Hotchkiss

noted that there was no damage to the truck and that there had been no obstruction in the road

before the bump. (Id. at 21, 23-4.) Interestingly, Hotchkiss stated that after checking the truck

and noticing the accident behind them, they waited "in case...somebody was coming after us." (Id.

at 16.) If there was no obstruction in front of the truck and the front tires struck nothing, yet the

rear tires struck or ran over some object, a logical inference would appear to be something

dropping from the undercarriage of the truck behind the front wheels. As the spare tire cage is

mounted to the undercarriage behind the passenger area, a spare falling from the cage and hitting

the rear wheels would match this inference. Hotchkiss appears to have implicitly reached the

same conclusion, given his concern about the accident behind him. In addition, Officer Ellison

stated that the tire in the road appeared to match the tires on the government truck, and that an

unidentified witness indicated the tire had fallen from the government truck. (Ellison Dep. at 8, 18.) Lastly, the government's initial interrogatory response supports Plaintiff's theory.

The government relies heavily on the trial testimony of Hollowood and the vehicle's maintenance and assignment records. The latter can be disposed of quickly. That the GSA assignment form shows that the vehicle did not have a spare when transferred to MCCS (long before the accident) tells us nothing about how the vehicle was maintained and equipped at the MCCS motor pool. Similarly, that the vehicle's repair records show a repaired flat tire the day before the accident tells us little about whether the repaired tire was remounted on the truck or utilized as a spare and placed in the cage on the day in question. Hollowood's testimony, however, will be examined in some detail.

Hollowood made the following points in his testimony at trial (Trial Transcript, Vol. I at 110, *et seq.*):

1. that it's pointless to carry a spare in the cage because operators cannot change a flat on the road;

2. that the tire in the photo is a retread;

3. that the tire in the photo could not be the spare from the government vehicle because retreads are never used on GSA vehicles;

4. that the tire in the photo could not be the spare from the government vehicle because retreads cannot be used on the front of trucks, pursuant to regulations (hence it would be useless if a front tire went flat);

5. that its virtually impossible ("defies laws of physics") for a spare tire to pop out of the cage, as it normally takes two people to lift it out; and

6. that he failed to identify the tire in the photo as a retread at his deposition because he was not asked if it was a retread at his deposition.

In light of various limitations and inconsistencies, the court concludes Hollowood's testimony is entitled to little weight. Significantly, Hollowood concedes that he has no knowledge of the critical issue of whether the truck had a spare in the tire cage when it left the base on the day of the accident. (Trial Transcript, Vol. I at 183-4, 194.) Moreover, Hollowood concedes that he did not know what the truck had on it because it was assigned to the Del Mar Beach facility, and that spare tires are left to the discretion of the manager. (Trial Transcript Vol. I at 143, 184). Thus, his statement about the use of retreads on GSA vehicles would appear to carry more weight coming from the Del Mar Beach manager, particularly in light of Hollowood's comment that retreads were used on other base vehicles. (*Id.* at 194.)[10] Further, his statement that its nearly impossible for a tire to "pop out" of the cage had key limitations, notably that the tire must be properly seated and the cage undamaged. (*Id.* at 190.) This is a significant concession, given Jiminez may not have done a safety inspection or "walkaround" before leaving the base. (Hollowood Dep. at 39.)[11] In addition, Hollowood's explanation as to why he failed to identify the tire as a retread in his deposition is disingenuous. At his deposition he was asked generally if the tire had any distinguishing features and he replied in the negative. (Hollowood Dep. at 23.) That the tire may be a retread, and therefore could not be used on a GSA vehicle, would appear to

---

[10] As the base had several GSA and non-GSA vehicles, it would appear rather easy for a mechanic or helper to put a retread in the rack of a GSA vehicle by mistake.

[11] Jiminez's failure to recall whether the truck had a spare that morning could well indicate that he did in fact fail to do a safety inspection.

fairly qualify as a distinguishing feature. Further, as regards operators changing tires, at his deposition, he opined that operators were encouraged to fix their tires on the road. (*Id.* at 30-32.)

In a sense, Plaintiff prevails on this issue because the government has not posited a reasonable contrary hypothesis that matches the evidence. The government's entire position is based on the assumption that the tire in the road could have come from another source. There appear to be two possibilities. First, that the tire was on the road for a significant period of time. Given the morning rush hour was just ending and a large tire blocking a lane of highway would cause an instant disruption in traffic, this possibility is implausible. Second, that the tire was dropped from another vehicle at approximately the same time and the same place that Plaintiff alleges the government truck lost its spare. Given that the mystery driver might not have realized he lost the tire, or sped up upon seeing the accident to avoid being held accountable, his absence from the scene of the accident would not be surprising. However, while the mystery driver theory accounts for some of the evidence in the record, it does not account for all of it. In particular, the mystery driver theory ignores Jiminez and Hotchkiss' statements that, even though they saw nothing in the road, they felt a "bump" under their vehicle at their rear wheels that was so severe that they immediately pulled over to check for damage. The most likely, indeed the only truly reasonable inference on the current record is that the "bump" Jiminez and Hotchkiss felt was their spare tire falling out of its cage and hitting their rear tires.

As to whether the tire or Lopez was the sole cause of the accident, the parties' contentions can be disposed of in short order. Plaintiff's "new" position that Lopez was utterly blameless in the accident is at odds with her complaint and conduct in obtaining a default judgment against him. Moreover, as will be discussed later, the record indicates at least some basis for according a

13

portion of the fault to him. Similarly, the government's contention that Lopez is solely responsible is unpersuasive. Clearly, dropping a 200 pound obstruction in the path of oncoming highway traffic played a significant role in the accident. Further, that one defendant is in default in no way prevents a finding of liability against a joint tortfeasor at trial. Lastly, Trooper Ellison's conclusion that Lopez's negligence caused the accident is in no way binding on this court, and our assessment of the evidence compels a different conclusion. Moreover, Ellison's report specifically acknowledges that Jiminez "contributed" to the accident by failing to adequately secure his spare tire. (Plaintiff's Exhibit K, Section 2 at MPH58-59.)

In sum, the court concludes that the Plaintiff has proven by a preponderance of the evidence that the tire in the roadway belonged to the government truck. Moreover, the parties appear to agree that motorists have a duty to securely attach their vehicle's equipment to prevent accidents of the type that occurred in this case. Indeed, Trooper Ellison stated that a motor vehicle operator can be cited for failing to do so. (*See* Ellison Dep. at 24.) So, allowing the tire to come loose and fall in the path of other traffic is clearly a breach of a duty owed by the government agents to other motorists. As the tire was obviously a substantial factor in bringing about the accident, the government is liable for the damages caused by the accident.

## B. Causation of Spinal Injury

The only real dispute as to causation focuses on Plaintiff's neck/back surgery.[12] Plaintiff maintains that the accident was the sole cause of her spinal problems. The government maintains that Plaintiff's difficulties are solely due to cervical spondylosis, a degenerative condition that

---

[12]The government has apparently conceded that Plaintiff's eye was injured in the crash, and that her subsequent medical treatment was related to this injury.

Plaintiff had long before the accident. Both sides have relied on medical testimony on the issue of causation. Plaintiff's case rests heavily on the deposition testimony of her surgeon, Dr. Caron.[13] The government's case rests on the testimony of their medical expert, Dr. Phillips. Unfortunately, neither witness appears to have had a complete record to review, which limits their conclusions somewhat.

Dr. Phillips opined that the Plaintiff's need for surgery was the result of a preexisting condition — cervical spondylosis — and not due to the car accident (Trial Transcript, Vol. II at 217, *et seq.*). *See also* Government Exhibit D, Phillip's Report. Dr. Philips focused on treatment notes of her prior physicians showing a history of cervical spondylosis as early as 1988. (Trial Transcript, Vol. II at 222-3.) *See* Plaintiff's Exhibit K, Section 24 (medical records) at MPH421, 426, 428, 450, 464.[14] Dr. Phillips stated that the post-accident complaints were typical of soft tissue injury, that there was no radiculopathy (pains shooting down arm) or other neurological symptoms <u>immediately</u> after the accident, that the symptoms were markedly different in 1998, and that the bony spurs (indicative of spondylosis) on the vertebrae in 1998 would have taken ten years (rather than a year and a half) to develop. (Trial Transcript, Vol. II at 223-6.)

--------------------------------------------

[13]In her reply brief, Plaintiff belatedly attempts to transform Dr. Caron's testimony from that of a treating physician to that of an expert. As Dr. Caron was never tendered or disclosed as an expert in the Final Pretrial Order, this attempt may be improper. However, the government has not objected to the use of any of Dr. Caron's deposition testimony or conclusions on this basis.

[14]Plaintiff argues that the references to cervical spondylosis in these records, which Plaintiff herself submitted as reliable evidence of her medical history, are somehow meaningless. To the extent Plaintiff now attempts to classify statements in her medical history as empty, baseless asides by her physician, the court is unpersuaded. If the Plaintiff is arguing they can only be rendered meaningful by presenting accompanying X-rays or deposing the physician, she had ample opportunity to do so.

Plaintiff challenged Dr. Phillips' opinion on several grounds, most significantly as to when she began showing prominent symptoms of radiculopathy. On this point, matters were complicated by two factors. First, that Plaintiff failed to depose Dr. Phillips, and second, that some of the treatment records that Plaintiff attempted to use on cross were never produced in discovery. Ultimately, Plaintiff's cross examination scored three points – that surgery of this type could be necessitated by a trauma, that Dr. Phillips had gotten the Plaintiff's age wrong in his report (and age was significant factor), and that Plaintiff's radicular pain may have been evident no later than Fall of 1996. (Trial Transcript, Vol. II at 261, 275, 299). However, Dr. Phillips stood fast to his conclusion, emphasizing that there were no radicular pains noted in the emergency room visits, and radicular pain in late1996 would be indicative of worsening symptoms later (not at the time of the accident). (*Id.* at 265, 299.) After cross, Plaintiff's counsel further challenged Dr. Phillip's conclusions by calling Plaintiff as a rebuttal witness. On rebuttal, Plaintiff testified that she had radicular symptoms almost immediately after the accident. (Trial Transcript, Vol. II at 303.)[15]

Plaintiff relied on the deposition testimony of Dr. Caron, the surgeon who performed her disk fusion surgery. Dr. Caron concluded that the car accident caused her neck probems, based on Plaintiff's statement to him that she never had neck problems prior to the accident. (Dr. Caron Dep. at 20.) He also stated that the bony spurs on her vertebrae could have developed in a year and half. (*Id.* at 38-9.) Significantly, Dr. Caron was not made aware of her prior diagnosis of cervical spondylosis when he took her history for treatment, but was asked about its significance

---

[15]This rebuttal testimony conflicts somewhat with her surgeon's report that indicates radicular symptoms began in Fall 1996 (Plaintiff's Exhibit K, subpart 12 at 196).

at his deposition. He stated initially that "[u]nless she was being actively treated for cervical disk disease and radiculopathy and myelopathy prior to the auto accident, it would not change my opinion whatsoever." (*Id.* at 17.) He later somewhat equivocated, however. He observed that "[s]he, obviously, had some preexisting degenerative disease in her neck which was aggravated by this accident" and noted that he "wouldn't be at all surprised if she had multi-level degenerative disease dating all the way back to 1988...." (*Id.* at 36, 41). Most significantly, he noted that merely having cervical spondylosis did not mean she would have had further problems in the absence of the accident, concluding "[i]f we have clear X-ray findings of cervical spondylosis prior to the accident but she is not actively being treated and then a clear record of active treatment since the time of the accident until I saw her, then I think it's reasonable, within a reasonable degree of certainty to assign the eventual need for surgery to the accident." (*Id.* at 36, 40.)

Given that Dr. Phillips was aware of her prior diagnosis and Dr. Caron was not, the court credits Dr. Phillip's conclusions that Plaintiff had cervical spondylosis prior to the accident, and that the spurs on her vertebrae were developing long before the accident. Nonetheless, the court also concludes that Dr. Caron's statement that the accident aggravated her condition and necessitated surgery is on the mark. While Plaintiff emphasized the intensity of the crash, the fact remains that both she and her passenger left the vehicle under their own power. Moreover, her passenger, who was of comparable age and closer to the point of impact with Lopez's vehicle, was essentially unhurt. These facts also counsel in favor of concluding Plaintiff was particularly vulnerable due to a preexisting condition. Dr. Phillips contrary conclusion that the accident and the subsequent surgery were unrelated is ultimately unpersuasive. Plaintiff began having

radicular symptoms, which Dr. Phillips seemed to deem the key to his conclusion, far earlier than he initially understood.[16]  Moreover, given Dr. Phillip's testimony about the large percentage of people with X-ray changes in their spine indicative of potential cervical spondylosis that are otherwise asymptomatic (Trial Transcript, Vol. II at 277-8), Dr. Caron's conclusion that Plaintiff may well have never have experienced problems in the absence of the car wreck appears reasonable.  As the government as presented no evidence of prior active treatment for cervical spondylosis,[17] the court can only conclude that the accident was the trigger that set Plaintiff's spinal woes in motion.

In sum, after evaluating all the medical evidence, the court concludes that the accident aggravated a preexisting condition and necessitated a surgical outcome that may not have been necessary (or at least not as soon) in the absence of the accident.

## C. Damages

The Plaintiff has presented evidence of economic damages in the amount of $85,862.04, which includes $83,862.04 in past medical bills and $2000 in anticipated expenses for further eye surgery.  Plaintiff has not claimed any lost wages or other out of pocket expenses.  The government has not quibbled with these figures.  Therefore, the Court finds economic damages in the amount claimed.  As to non-economic damages, the Plaintiff has asked for 2 million dollars,

---

[16] The court also suspects that identifying radicular pain as such in the context of a severe car accident with a 60 year-old victim would be difficult in the early "emergency room" stages. Plaintiff stated that her "whole body" was sore after the crash.  It would appear to be difficult for the patient to distinguish radicular pain from soft tissue injuries or general soreness at that stage.

[17] The record raises more questions than it answers on this point—why would the prior physicians have reason to note cervical spondylosis if there were no symptoms and no treatment? However, the government produced nothing to develop this point, and, in the absence of evidence, the court cannot and will not speculate.

less the economic damages sought.[18]   The government argued that Plaintiff should be limited to the amount of her original administrative claim.  The government also maintained that her $2,000,000 claim is grossly exaggerated, and recounted at some length that Plaintiff's physical activities were on the decline well-before the accident.

Government reargument of its earlier position that Plaintiff should not be permitted to claim damages in an amount larger than that sought in her original administrative claim can be disposed of quickly.  The court is persuaded that, given the fairly conservative course of treatment that Plaintiff was following, she was not aware of, nor could she reasonably anticipate, the full severity of her spinal and eye injuries when she filed her administrative claim in early 1997.  *See generally Milano*, 92 F.Supp.2d at 774 (worsening back condition).

Plaintiff testified at length the impact the accident has had on her life, and the court concludes that her testimony is credible.  Plaintiff experienced pain and suffering as an immediate consequence of the accident, and was forced to undergo emergency care in various cities in the days following the accident.  Plaintiff has undergone an operation on her left eye, and now anticipates further surgery on the eye.  Moreover, she has stated that the eye has been dry and uncomfortable since the accident, including the sensation that there is a foreign object in the eye as a result of the scarring, and that her vision has worsened and she can no longer wear contact lenses.  Plaintiff has also had very serious spinal surgery, that has left her with a greatly reduced range of motion in her neck.  Moreover, Plaintiff experienced progressively worsening neck pain

---

[18]In their rebuttal closing brief, Plaintiff's counsel represents that such a verdict would be consistent with other awards, but cites no authority nor provides examples, nor explains the context of those other awards.  A cursory review of the Westlaw database for California jury awards in motor vehicle cases did not appear to bear out counsel's contention.

and limitations on her activities as her condition deteriorated to the point that surgery was required. Further, after surgery, Plaintiff was forced to undergo a lengthy period of physical therapy and to substantially limit her activities.

While Dr. Caron stated that Plaintiff had an excellent outcome on her spinal surgery, he also stated that she will never have a full range of motion in her neck, that she will have intermittent neck and shoulder pain, and that she will have residual tingling and occasional pain in her right arm. (Dr. Caron Dep. at 31-2). Plaintiff also indicates that driving is difficult, as she cannot turn her head, and that she is concerned about passing future driving tests. Plaintiff also testified that she cannot lift heavy objects, including her grandchildren, and has altered her teaching assignments to accommodate this limitation. Plaintiff has also stated that she can no longer play golf or tennis, although Dr. Caron's assessment differs on this point (Dr. Caron Dep. at 43), but can still do some swimming and water aerobics. All told, Plaintiff appears to have remained active and productive despite the surgery.

After hearing all the testimony and reviewing the entire record, the court concludes that the Plaintiff's non-economic damages amount to $250,000. The court believes that this figure fairly compensates her for the pain, suffering, inconvenience, and general loss of enjoyment of certain life activities that she has experienced since the accident, which substantially aggravated her preexisting degenerative condition.

**D. Apportionment**

There appears to be one further issue to be addressed before we are through. While neither party has cited or discussed it, the California Fair Responsibility Act, Cal. Civ. Code § 1431.1 *et seq*, appears to be implicated in this case. The California Fair Responsibility Act has

20

eliminated the rule of joint and several liability for non-economic damages; tortfeasors will be liable only in relation to their portion of actual fault for non-economic damages. *See Martin v. United States*, 984 F.2d 1033, 1038-40 (9th Cir. 1993). *See also In Re Piper Aircraft*, 792 F.Supp. 1189, 1191-3 (N.D. Cal. 1992). Economic damages are defined as "objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities." Cal. Civ. Code § 1431.2 (b)(1). "Non-economic damages" are defined as "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." *Id.* at (b)(2).

Thus, both Lopez and the government are jointly and severally liable for Plaintiff's economic damages of $85,862.04. As to how the non-economic damages should be apportioned, the parties' submissions are of limited utility, as the government attempts to foist all the blame on Lopez, and the Plaintiff attempts to hang all fault on the government. In sum, we must conclude Plaintiff's view is a bit closer to the mark.

While the record is far from perfect, Lopez's own deposition provides support for Trooper Ellison's conclusion that Lopez was following too closely and not keeping an adequate lookout. In particular, Lopez's comments about being on top of the tire as soon he saw it, *see* Lopez Dep. at 34-5,56, indicate that he may not have been keeping an adequate interval between himself and the vehicle ahead of him. If he had, he may have been able to avoid the tire, or at least slowed down enough that the impact would not have resulted in the complete loss of control of his vehicle. The court concludes Lopez shares some blame.

Nonetheless, the court must conclude that the government must bear the lion's share of the fault. The fact remains that a 200 pound tire was dropped in the path of traffic on a California freeway. Moreover, the tire most likely slipped/popped from a rack *below* the truck, making it even more difficult for the vehicles immediately behind the truck to spot until they were nearly on top of it. In such circumstances, injuries and property damage were the nearly inevitable consequence of the government agent's carelessness. The court concludes the proper apportionment of fault for noneconomic damages is 5% to Lopez and 95% to the government.

## CONCLUSION

For the foregoing reasons, the court renders judgment in favor of the Plaintiff and against the Defendant United States. The court holds that the Defendant United States and Defendant Lopez are jointly and severally liable for Plaintiff's economic damages in the amount of $85,862.04, and the court also holds that Plaintiff's non-economic damages of $250,000 are to be apportioned 95% to the Defendant United States and 5% to Defendant Lopez.

**ENTER:**

JOHN A. NORDBERG
Senior United States District Judge

DATED: *October 2, 2001*